IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PRINCE SOLOMON KNOX, ) <br> A# xxx-xx1-508, ) <br> ) <br>           Petitioner, ) <br> ) <br>  vs. ) <br> ) <br> DAMON ACUFF, in his official capacity as ) <br> Warden of Pulaski County Detention Center, ) <br> ROBERT GUADIAN, in his official capacity ) <br> as Field Office Director, Chicago Field Office,) <br> U.S. Immigration & Customs Enforcement, ) <br> MATTHEW T. ALBENCE, in his official ) <br> Capacity as Deputy Director and Senior ) <br> Official Performing the Duties of Director of ) <br> U.S. Immigration & Customs Enforcement, ) <br> and ) <br> CHAD WOLF, in his official capacity as ) <br> Acting Secretary of the U.S. Department of ) <br> Homeland Security, ) <br> ) <br>           Respondents. ) | Case No. 20-cv-822-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief District Judge:**

Petitioner Prince Solomon Knox is currently in immigration detention at the Pulaski County Detention Center in Ullin, Illinois (Doc. 1). He filed an Emergency Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 on August 24, 2020, claiming that his continued detention has become unconstitutionally prolonged and that his health is at risk due to the conditions of his detention. He seeks immediate release or, in the alternative, an immediate bond hearing at which the Government has the burden to justify his ongoing detention. (Doc. 1, pp. 24-25). Respondents responded to the Petition (Doc. 10), and Knox replied. (Doc. 18). In light of the Court's findings outlined below, Knox's request for immediate release is **GRANTED**.

1

## BACKGROUND

Knox is a 58-year-old native of Sierra Leone who has resided in the United States since 2004. He was admitted to the United States under a resettlement program for Liberians in the Ivory Coast; he qualified as the spouse of a Liberian national (who came to the U.S. with Knox). (Doc. 1, p. 3). In 2007, he was convicted of visa fraud and making false statements to federal agents.[1] (Doc. 1, p. 4; Doc. 1-3; Doc. 10, p. 2); *United States v. Knox*, Case No. 06-cr-917 (N.D. Ill.), *aff'd* 540 F.3d 708 (7th Cir. 2008). He was sentenced to 12 months in prison. (Doc. 10, p. 2). Knox served his sentence and upon release was taken into custody by the Department of Homeland Security ("DHS") in December 2007. (Doc. 10, p. 2).

In February 2008, DHS began removal proceedings based on Knox's criminal conviction and visa fraud. In June 2008, an Immigration Judge ("IJ") denied his requests for asylum, withholding of removal, and protection under the Convention Against Torture, and ordered him removed to England or Sierra Leone. (Doc. 10, p. 2; Doc. 10-1, p. 3). Knox appealed, but the removal order was affirmed. (Doc. 10, p. 3). DHS's Enforcement and Removal Office ("ERO") was unable to remove Knox, however, after the British Consulate refused to admit him, and Sierra Leone refused to issue a travel document for him. In May 2009, Knox was released from DHS custody under an order of supervision. (Doc. 10, p. 3; Doc. 10-1, p. 4).

Knox remained free under DHS supervision for more than 10 years, residing primarily in the St. Louis area, without any incident and in compliance with all reporting and other requirements. (Doc. 1, pp. 1, 4). During that time, ERO never succeeded in obtaining travel documents to carry out the removal order. In March 2012, ERO sought travel documents for Knox

---

[1] Knox was charged with failure to disclose his affiliation with three armed rebel groups active in Sierra Leone between 1991-2002 which were responsible for human rights violations. (Doc. 1-2 in Case No. 06-cr-917). Knox still contends he was not involved with those groups. (Doc. 1-1, p. 2).

from Liberia, where his mother had status, but the request was denied. *Id.* In October 2017, ERO again requested travel documents from Sierra Leone but none were issued. *Id.*

In August 2019, Knox was arrested as part of "Operation No Safe Haven V," which targeted "fugitives" with outstanding removal orders who were "known or suspected human rights violators." (Doc. 10, p. 3). He was told that he would be removed the following month, but he has remained in detention since that time, a period now exceeding 13 months. (Doc. 1, p. 1). Renewed efforts to obtain travel documents for Knox from Sierra Leone have been unsuccessful. (Doc. 10-1, p. 5; Doc. 10, pp. 4, 20; Doc. 18, pp. 2; Doc. 18-1, pp. 2-3).

Knox alleges that his removal from the United States is not reasonably foreseeable. He has available housing where he can quarantine if necessary upon his release, with the U.S. Citizen mother of his youngest child (who is also a U.S. Citizen). Based on his ten-year history of compliance with conditions of release prior to his August 2019 detention, Knox asserts that he does not pose a flight or public safety risk.

While in custody at Pulaski, Knox contracted COVID-19. Although he has been deemed recovered from that infection, he continues to have serious symptoms including chronic chest pain, and he suffers from diabetes, high cholesterol, and high blood pressure. Knox's diabetes is of recent onset, diagnosed in May 2020 during his detention at Pulaski. He alleges that he has been denied adequate medical care while in custody and has been unable to maintain a healthy diet or exercise to manage his conditions, which have become worse at Pulaski. (Doc. 1, pp. 5-7, 9-10; Doc. 1-1, pp. 4-6; Doc. 1-2, pp. 2-14). Further, he recently developed a skin condition which is linked to stress on his immune system, according to a dermatologist. (Doc. 18-1, p. 3).

Knox's Petition raises three claims of entitlement to release from custody: (1) His prolonged detention following his removal order violates his Fifth Amendment right to Due

3

Process; (2) His conditions of confinement are subjecting him to a substantial risk of serious harm to his health, in violation of his Fifth Amendment right to substantive due process; and (3) Respondents' failure to provide him with adequate medical care violates his Fifth Amendment right to substantive due process. (Doc. 1, pp. 22-24).

## DISCUSSION

Under 28 U.S.C. § 2241, a federal habeas court may grant release to a person who "is in custody in violation of the Constitution or laws or treaties of the United States." Noncitizens may challenge the fact of their civil immigration detention via a Section 2241 petition. *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001).

Respondents concede that Knox's claim for habeas relief based on the length of his detention and the unlikely prospect of his removal in the foreseeable future is properly before the Court. (Doc. 10, p. 19). Yet they contend that he should remain in detention because efforts are ongoing to secure travel documents to effectuate his removal.

Because a final removal order was issued in Knox's case, he is in detention pursuant to 8 U.S.C. § 1231 ("Detention and Removal of Aliens Ordered Removed"). This section contemplates that ordinarily, removal from the United States should be accomplished within 90 days after the removal order becomes final. 8 U.S.C. § 1231(a)(1). If the person is not removed within the 90-day removal period, s/he may be released on supervision. 8 U.S.C. § 1231(a)(3). Detention may continue beyond 90 days if certain criteria are met:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

4

Construing this statute, the Supreme Court in *Zadvydas* ruled that a noncitizen's detention may not continue indefinitely. Instead, the Constitution "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Zadvydas*, 533 U.S. at 689. The Court concluded that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. It set forth a presumption that a 6-month period of detention was reasonable. However, if detention continues beyond that benchmark, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. Notably, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

Like Zadvydas, Knox's order of removal is final and neither his country of origin nor any other prospective country to which he might be removed is willing to accept him. His current detention exceeds one year, and he was previously detained for another approximate 6-month period following the issuance of his removal order. He was released from immigration detention in 2009 because authorities were unable to obtain travel authorization to remove him from the United States. Now, despite several attempts to repatriate him to Sierra Leone, Knox has shown that there is no significant likelihood of his removal in the reasonably foreseeable future. Indeed, in his August and September 2020 communications with officials of the Sierra Leone embassy, Knox was informed that his application for travel documents has again been denied. (Doc. 18-1, pp. 2-3). Respondents have not put forth any information to suggest that the government of Sierra Leone would ever reverse their repeated refusals to admit Knox and issue travel documents for him, let alone do so within a reasonably foreseeable time frame. They have provided no specifics

5

on the ERO's claimed "continue[d] communications" with Sierra Leone officials regarding Knox's case. They rely on the fact that a handful of other Sierra Leone nationals have been repatriated since the August 2019 detentions, but given the specifics of Knox's case, those examples fail to demonstrate any likelihood that Knox will be permitted to return when he has been consistently turned down over the past 12 years. (Doc. 10, pp. 19-20; Doc. 10-1, pp. 4-5; Doc. 18, pp. 1-2). Further, Respondents have drawn no connection between any possible difficulties presented by the current COVID-19 pandemic and their inability to obtain travel documents for Knox which might justify continuing his detention – Knox spent over 6 months in custody before the onset of the pandemic, during which ERO was unsuccessful in obtaining travel documents for him. Simply put, Respondents have not come close to rebutting Knox's showing that they are not likely to effectuate his removal in the reasonably foreseeable future, as *Zadvydas* requires.

Furthermore, Respondents have not even attempted to justify their continued civil confinement of Knox with "clear and convincing evidence" that he is either a flight risk or poses a danger to the community. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); 8 U.S.C. § 1231(a)(6). Knox's 10-year record of compliance with his conditions of supervision and regular reporting to immigration authorities from 2009-2019 belies any suggestion that he poses a risk of flight or a danger to others.

Having concluded that Knox is entitled to release pursuant to the standards set forth in *Zadvydas*, the Court finds it unnecessary to address his claims of entitlement to release based on the conditions of his confinement and deprivation of adequate medical care. That said, Knox's allegations raise serious concerns with respect to infection control measures at Pulaski as well as the medical treatment he has received there. Further, because Knox will be released from a facility which continues to experience COVID-19 transmission among detainees, he cogently points out

that upon his release from Pulaski he may present a risk of COVID-19 infection to members of the public if he must rely on public transportation to return to his home area of St. Louis. (Doc. 18, p. 3; referencing the 2011 Performance-Based National Detention Standards ("PBNDS") governing ICE facilities).[2] Accordingly, to mitigate this danger to the public, Respondents will be directed to transport Knox to the St. Louis home where he will reside upon his release.

## DISPOSITION

**IT IS HEREBY ORDERED** that the Emergency Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED**.

Respondents are **ORDERED to IMMEDIATELY RELEASE** Petitioner Prince Solomon Knox, pursuant to the following conditions:

1. Petitioner will reside at a certain residence, will provide his address and telephone contact information to Respondents, and will quarantine there for at least the first 14 days of his release;

2. Petitioner will comply with national, state, and local guidance regarding staying at home, sheltering in place, and social distancing;

3. The Court's order for release from detention may be revoked and Petitioner may be re-detained should Petitioner fail to comply with this order of release or with any condition of release set by the Department of Homeland Security ("DHS")/Immigration and Customs Enforcement ("ICE");

4. This Order does not prevent Respondents from taking Petitioner back into custody should Petitioner commit any crimes that render him a threat to public safety or otherwise violate the terms of release;

5. Respondents will provide transportation for Petitioner Knox from Pulaski County Detention Center to the home where he will reside in St. Louis; and

6. Petitioner will not violate any federal, state, or local laws.

---

[2] The 2011 PBNDS sets forth standards for detention facilities such as Pulaski, and state that "release from a facility shall be consistent with safety considerations and shall take into account special vulnerabilities…. Facilities that are not within a reasonable walking distance of … public transportation shall transport detainees to local bus/train/subway stations[.]" 2011 PBNDS at 58-59, found at https://tinyurl.com/y6ohtkog (last visited October 5, 2020). Pulaski is located 41 miles from the nearest train/bus station in Carbondale, Illinois.

7

The Clerk of Court is **DIRECTED** to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  October 5, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**